IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| COCA-COLA BOTTLING CO., CONSOLIDATED, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CIVIL ACTION NO. 05-0230-P-B |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, AND HELPERS, LOCAL UNION NO. 991, | ) ) ) ) ) | |
| Defendant. | ) | |

ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT

This is an action brought by plaintiff Coca-Cola Bottling Co. Consolidated, Inc. (hereinafter referred to as "CCB"), against defendant the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 991 (the "Union"), seeking to vacate a labor arbitration award issued under the terms of a collective bargaining agreement.   Pending before this court are cross-motions for summary judgment filed by both parties pursuant to Rule 56 of the Federal Rules of Civil Procedure: 1) CCB's Motion For Summary Judgment (docs.19-20); and 2) the Union's Motion For Summary Judgment (docs.21-23).  Responses to each of these Motions have been filed by CCB (doc.26), and by the Union (doc.27).   After careful consideration of all relevant matter, and the record as a whole, this court finds:  1) CCB's Motion For Summary Judgment (docs.19-20), is DENIED; and 2) the Union's Motion For Summary Judgment (docs.21-23), is GRANTED.

A.  Procedural History

CCB filed this action on April 15, 2005 (doc.1).  This court has jurisdiction pursuant to 28 U.S.C. § 1331, under Section 301 of the National Labor Relations Act, 29 U.S.C. § 185 (the "Act").  The Act

provides:

> For the purpose of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members.

§ 185(c).  Venue is proper insofar as the Act states:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in the Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

§ 185(a).

It is undisputed that CCB is a corporation licensed to do business in Alabama and is an employer engaged in commerce within the meaning of the Act, operating distribution centers and a bottling facility in Mobile County, Alabama.  29 U.S.C. § 152(2).  The Union is an unincorporated association and labor organization within the meaning of the Act.  Id., at § 152(5) (doc.1 ¶2-3).

CCB alleges that the parties have been and remain at all relevant times bound by the terms of a collective bargaining agreement (the "Agreement"[1]).  CCB alleges that under the Agreement, it has the express right to establish new classifications and to set wages for those classifications (Article 27); to establish or revise its distribution system (Article 5-27); and that the Union has no specific right to operate pursuant to any defined distribution system or to prevent CCB from staffing new classifications (doc.1, ¶6-8).[2]

---

[1]  The "Articles of Agreement Between [CCB] and [the Union] [-] Term of Agreement July 10, 2002 through July 9, 2005" (doc.19, Ex.C, J1 - the Agreement; doc.23, Ex.A).

[2]  CCB alleges that Article 2 of the Agreement constitutes

> a management rights clause which permits the employer [i.e., CCB] to plan, direct, and control all operations of its business and to make rules and regulations relating to its operations.  "Nothing in this Agreement shall be deemed to limit [CCB] in the exercise of those rights, although nothing in that clause should be interpreted to "nullify any of the **specific** provisions" of the Agreement.

(doc.1, ¶4-5) (emphasis in original).

CCB alleges that on May 3, 2004, under its express authority and after notice and consultation with the Union, it implemented a new system of delivery routes throughout Mobile. CCB alleges that as a result of the new system, the Union's employees when compared with the previous routing system, accrued an increase in annual compensation, generally. Id., ¶9, 11.

CCB alleges that on May 6, 2004, the Union filed a grievance challenging the implementation of the new system under the grievance arbitration mechanism within the Agreement. In October 2004, the grievance was arbitrated before Arbitrator Harold Curry. Id., ¶10, 12. CCB alleges that on April 8, 2005, the Arbitrator rendered a decision granting the Union's grievance in "deliberate contradiction" to the express agreement rights of CCB. CCB alleges that the Arbitrator directs it "to make the 'Union whole for any loss of compensation' without similarly ordering the Union or its members to make [CCB] whole for any overpayments to [CCB] employees. The Arbitrator similarly seeks to retain jurisdiction over the grievance arbitration for a period of 120 days despite no such authority being provided by the [Agreement]." Id., ¶14. CCB alleges that the Arbitrator's Decision and Award are incomplete and ambiguous to the extent that it is impossible to determine how to comply with the Award. Id., ¶15.

CCB claims that the Arbitrator's Award imposes upon it a duty to abandon its express Agreement rights to control its operations, i.e., to re-route drivers and overpay them; it undermines the utility and integrity of the Agreement; and denies CCB the ultimate decision making and operations authority guaranteed under Articles 2, 5, and 27 of the Agreement. CCB asks this court to vacate the Award, and seeks attorney's fees and costs. Id., ¶17-19.

On May 5, 2005, the Union filed its Answer and Counterclaim to Enforce Arbitrator's Award (doc.7). The Union alleges that the parties voluntarily submitted to binding arbitration provided for in the Agreement, and that the Arbitrator acted within his authority conferred by the Agreement. Id., ¶28-29. The Union alleges that even though the Arbitrator's binding Decision and Award was issued on April 8, 2005, CCB has refused and failed to implement the award in violation of the Agreement, and federal labor law. The Union asks the court to enforce the Award, and argues that any disputes regarding the

3

proper calculation of the Award should be addressed to the Arbitrator (doc.23). The Union also seeks attorney's fees for its enforcement efforts. Id., ¶30; doc.23).

On May 25, 2005, CCB filed its Answer to the Union's Counterclaim and requests its attorney's fees in defending against the Counterclaim (doc.9).

On July 20, 2005, the Rule 16(b) Scheduling Order was entered noting the inappropriateness of formal discovery under 9 U.S.C. § 6 ("Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions,..."). This court set an October 19, 2005 deadline for dispositive motions (doc.18, items 8, 16).

On October 19, 2005, CCB filed its Motion For Summary Judgment (docs.19-20), and the Union filed its Motion For Summary Judgment (docs.21-23). On November 21, 2005, CCB filed its Reply to the Union's Motion For Summary Judgment (doc.26), and the Union filed its Submission In Opposition to CCB's Motion For Summary Judgment (doc.27).

B. Findings of Facts

CCB produces and distributes Coca-Cola brand products under a franchise (doc.19, attachment 16, p.3, ¶2). CCB and the Union are parties to the Agreement which governs the terms and conditions of bargaining unit employees at CCB's facility in Mobile, Alabama. Id; doc.23, ¶1.

The Agreement between the parties was entered into on August 27, 2002, "to provide for the operation of [CCB] under methods which will further, to the fullest extent possible the safety and welfare of the [e]mployees, economy of operations, quality and quantity of output, cleanliness of facilities, protection of property, customer service, innovation, and harmonious relations." (doc.23, Ex.A, p.1, 40). The Agreement provides:

> Nothing in this Agreement shall be deemed to limit [CCB] in any way in the exercise of the regular and customary functions of management, including, without limitation, the right to plan, direct and control all operations, and the right to make, in connection therewith, such rules and regulations relating to operations as it shall deem advisable. This shall not be interpreted to nullify any of the specific provisions of this Agreement.

4

The provisions of the contract shall prevail if there is a conflict with rules established by [CCB].

(doc.23, Ex.A, p.2, Art.2).

Article 5 provides, in part:

Section 1:

[CCB] and the Union recognize the principle of seniority based upon length of service, ability and experience of the employees in its application to promotion, transfer, job selection, laid off and recall.

[CCB] seniority shall be defined as the uninterrupted length of service an employee has been employed by [CCB]. Departmental seniority shall be defined as the uninterrupted length of service the employee has worked in the department.

It is recognized that departmental seniority is an exception to the general principle of [CCB] Seniority. Controlling seniority for bidding purposes, promotions and shift preference within these departments is departmental seniority. Employees within a department will have the first opportunity for any job vacancy within their department based on their department seniority. If the job cannot be filled from within the department, then bids from other departments will be accepted to fill the vacancy. [CCB] wide seniority is the controlling seniority for layoff situation.

A list of employees in order of their seniority shall be posted on the official bulletin boards at their places of employment twice a year on August 1st and February 1st. A copy will be sent to the Union and a department list will be given the steward in each department. Any objections to the seniority standing shown on the list must be made within fourteen (14) days from the date of posting, and any controversy over the seniority standing of an employee on this list shall be handled under the Grievance Procedure.

Section 2: (Job Vacancies and Bids)

A.) Job Bids

Notice of job vacancies shall be posted within seven (7) days after a determination by [CCB] that a vacancy exists.

Notice of all new jobs and job vacancies covered by this agreement shall be posted on the bulletin boards of [CCB] for a period of seven (7) calendar days. All subsequent job bids, which are a result of the original new job or other job vacancy will be posted on the bulletin board for a period of two (2) working days. Successful bidders will be placed in their new positions within 30 days of the conclusion of the entire bid process, including subsequent bids being awarded.

If there is more than one qualified employee with the ability and fitness to perform the job, the senior employee will be designated the successful bidder. For purposes of job bids, departmental seniority shall apply. When choosing among bidders

who have no departmental seniority, company seniority shall apply.  The successful bidder shall be on a trial basis for a period of not more than sixty (60) working days from the date of assignment.  If within the trial period [CCB] determines that the employee has not demonstrated ability to handle the job satisfactorily, [CCB] may remove such employee from such job and reassign him to the classification he held prior to such assignment.

In the event a new type job or new type route is created, no employee will be restricted from bidding on such new job or new route as outlined under Bid Locks of this section.

* * *

C.) Sales Department

When any route becomes open, [CCB] shall post a notice of the fact on the official bulletin board in the Sales room and mail a copy of the notice to each of the Warehouses and to the Union.  Any Sales Department Employee who desires to bid on the route, must sign the bid in accordance with the above mentioned bid procedure.  The job will be awarded to the qualified Sales department employee with the greatest department seniority.

If there is a major change in the Sales Department such as restructuring of routes that involves 25% or more of routes in that branch/location, they will be posted in the branch doing the re-route for seven (7) calendar days and may be posted on any day.  During the seven (7) day period, sales department employees will have the opportunity to review the new structure.  At the conclusion of the seven (7) day period, all sales department employees in that branch will exercise their sales department seniority and bid upon an available bargaining unit position...

D.) Bid Locks

The employee who is the successful bidder for any job will be required to remain in that job for six months before they can bid on another job.  The exception would be: If no other eligible employees bid on a job, if routes are restructured, or if they were bumped or laid off from the department and coming back from being bumped or laid off, the six (6) month restriction would not apply for the first bid.  Newly hired employees working in manufacturing (production, maintenance, quality assurance, warehouse, garage, transport) cannot bid for six (6) months from their hire date as a regular full time employee.

Id., p.3-5, Art.5.

The Agreement contains a prohibition on extra contract agreements:

[CCB] agrees not to enter into any agreement or contract with its employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. [CCB] is permitted to make and enforce any reasonable [CCB] rules which do not conflict with the provisions of this Agreement; all such rules to be posted

6

on the official bulletin boards for a period of seven (7) calendar days before becoming effective and the Union to be furnished a copy of such rules.

Id., p.18, Art.25.

With regard to sales personnel, the Agreement provides, in pertinent part:

Section 1: Route Driver-Salesperson

The parties to this contract agree that the following classifications for Route Driver-Salesperson shall be recognized:

Relief Salesperson, Bulk Account Salesperson, Bulk Delivery Driver, Senior Salesperson, Full Service Representative, Home Market Route Salesperson, Cold Bottle Route Salesperson.

* * *

Section 8: Miscellaneous Provisions for All Sales Employees

* * *

D.      [CCB's] intent in regards to routes is as follows: [CCB] will endeavor to set up the routes on a Winter-Summer basis whereby it will not be necessary for all routes to be "open" when the temporary Summer routes are added in the Spring and taken off in the Fall.

Further, [CCB] will endeavor to set the routes up so that the volume on the regular Home Market routes will be about 1,500 cases per week in the Summer and about 1,200 cases per week in the Winter.  The volume on the temporary Summer routes will probably be less than on the regular Summer routes.  The guideline for Bulk Account routes will be about 2,200 cases per week.

It is recognized that these volume figures are only goals to shoot for and many conditions will cause them to vary.  If the volume on the routes vary too far from these goals, [CCB] will make necessary adjustments in the routes to conform to good business practices, keeping in mind the best interest of the employees and [CCB]...

Id., p.19, Art.27.

The Agreement also contains a procedure for grievances and for arbitration of disputes between

the parties:

(A).      Grievance by Union and Employees

Step 1.
The aggrieved employee or steward under whose jurisdiction any grievance may arise, within five (5) working days of the occurrence shall

7

present the matter in writing to the aggrieved employee's manager. In the event the steward and manager cannot agree on adjustment of the matter within three (3) working days following receipt by the manager of the written grievance, the grievance may be taken to Step 2.

The five (5) day time limit shall apply to [CCB], the Union and the Employee in the same way. The Employee has five (5) working days to file a grievance from the time of knowledge and [CCB] has five (5) working days from the time of knowledge to take disciplinary action.

Step 2.
When a grievance is to be taken to this Step, the Business Representative shall, within three (3) working days after the expiration of the time limit in Step 1. present a written report setting forth the grounds or reasoning supporting the grievance to the Human Resource Director of [CCB], or such other representative as may be designated by [CCB]. The Business Representative and [CCB's] representative will attempt to adjust the matter within ten (10) working days after the Business Representative's report has been received by the Human Resource Director... If the grievance is not settled within the time limit provided in this Step, it is agreed that the parties may submit to arbitration as provided in Step 3, below, and any decision thereby rendered will be final and binding...

Step 3.
In the event either party desires to submit the grievance to Arbitration, it must be within thirty (30) calendar days after expiration of the time limit in Step 2 or..., make written request to the other party for Arbitration.

Promptly upon receipt of a request by either party in writing for arbitration, the parties shall ask the Federal Mediation and Conciliation Service to supply a panel of five (5) arbitrators. Either party may reject an entire panel once and request the furnishing of a new panel. Within twenty (20) working days of receipt of the panel, the parties shall meet to select an arbitrator by alternately striking names. The party requesting arbitration shall strike first. The fifth individual not so stricken shall be the arbitrator to hear the grievance involved in the panel request. Expenses incurred in arbitration proceedings shall be paid equally by the parties. Any decision rendered by the arbitrator must be within the scope of this Agreement, shall in no manner change any terms or conditions of the Agreement and shall be final and binding upon the parties.

(B).     Grievance by [CCB]

All rights granted to the Union and Employees shall correspondingly accrue to [CCB];...

Id., p.33-35, Art.33.

With regard to CCB's distribution system, CCB operated a "home market" system involving

"conventional" practices under which product deliveries were made to convenience stores and small supermarkets for consumption away from the point of sale while cold drink deliveries were made to accounts for "on premises" consumption at offices, restaurants, and manufacturing facilities (doc.19, attach.16, p.4, ¶6). The "home market" system operated with one individual, a route driver, who replenished stock at different pre-determined accounts from a truck loaded at the warehouse. Upon the completion of the route, the driver would return to the warehouse, and predict what stock would be needed for the next day to facilitate reloading inventory for the next day. Id., ¶7.

In an effort to improve sales and to better coordinate truck inventory with product demand, CCB found it needed more predictability in its truck inventory. Id., ¶8. In June 2002, CCB began considering a substantial re-route of its distribution system which would allow its employees to concentrate on sales and delivery of a more precise product volume, a "pre-sell" distribution. Id., ¶9. Under the "pre-sell" system, truck inventory is determined by customer orders placed in advance with account managers. A route driver delivering pre-sold product would experience minimal daily "haul back" volume (unwanted product). Although a route driver could still sell product. Id. On June 12, 2002, in the context of collective bargaining over Agreement Article 27 (sales employees), CCB notified the Union that it was necessary to implement the "pre-sell" distribution system in Mobile.[3] Id., ¶10.

CCB by letter dated January 27, 2004, announced to the Union that it

plans to change its distribution system to a Predictive Selling System, which will enable us to focus and improve upon our ability to service customers and continue to grow our business. This change will also allow us to remain competitive since our competition is already utilizing a Predictive Selling System in our contact area.

[CCB] will be making this change in accordance with the [A]greement between the parties. Specifically, the Company's right to operate the business as addressed through Article 2 - Management Prerogatives - Paragraph 1:

* * *

_____

[3] Throughout the Briefs and documentary evidence presented, the "pre-sell" distribution system is also referred to as "Predictive selling system" (doc.19, Ex.C, J-3; attach.16, p.7, ¶12; doc.23, p.2, ¶2), and a "predictive system" (doc.19, attach.16, p.15, ¶10, and Ex.A, p.35).

9

The transition to the new distribution system will facilitate the creation of several new job classifications.

Since new job types are being created, employees within the Sales Department will not be restricted from bidding on such new job types as outlined under Bid Locks of Article 5, Section 2(A).  Also, since this will amount to a change of at least 25% of the routes within the locations we will follow the procedure established under Article 5, Section 2 (C) - Paragraph 2...

* * *

In an effort to make this transition smoothly, [CCB] would like to meet with the Union committee on afternoon of January 27, 2004 to further discuss any of your questions about the new distribution system and job types.  In a meeting on February 3rd, 2004 the Company will inform you of the new rates for the various positions, given the various changes. [CCB] will welcome any input you may offer before we implement the new rates...

(doc.19, Ex.C, J-3; attach.16, p.7, ¶12).  Several follow-up meetings were held on February 3, 18, and March 23, 2004, to discuss the "pre-sell" system.  Id.  CCB conducted a comprehensive wage survey to facilitate wage structuring under Agreement Article 27, to insure minimal transition related adverse financial impact.  On May 3, 2004, CCB implemented the new distribution system.  CCB states that "[o]verall, employees... were earning $48.00 more per week under the new [pre-sell] system."  Id., p.7-8, ¶13.

CCB states that

[t]he two drivers classifications in issue (Tel-sell Delivery Merchandiser and Pre-sell Delivery Merchandiser) were earning between $125.00 and $150.00 more per week under the new system.  As such, these employees, whom the [Union] allege[s] are adversely impacted financially by the new system, were actually earning between $300.00 and $600.00 more each month... under the new system.  The post implementation data establishes that the [CCB] employees are earning more and handling (i.e., moving) fewer cases [of product] under the pre-sell distribution system...

Id., p.8, ¶14.

On May 6, 2004, the Union filed a Grievance protesting CCB's implementation of the new distribution system.  The Union states that the "system" is a "predictive selling system," and its implementation violates the Agreement (doc.23, ¶2).

By letter dated May 19, 2004, CCB noted:  "...  In regards to the grievances discussed dated January 27, 2004, February 3, 2004, April 26, 2004 and May 3, 2004 the Company respectfully denies your grievances on the grounds that the Company has acted within its negotiated rights."  (doc.19, Ex.C, J-6).

Because the parties were unable to negotiate a resolution, the parties proceeded to arbitration pursuant to the Agreement, Article 33 (doc.23, ¶2).  The Union, regarding a remedy, asked that CCB "return to the distribution system used in the past and honor the contractual wages and sales department classifications.  All employees should be made whole for any lost wages under this new system" (doc.23, Ex.A, p.8).

The Agreement provides for arbitration pursuant to the rules of the Federal Mediation and Conciliation Service (doc.23, Ex.A, p.33-35, Art.33, A, Step 3).

On October 20, 2004, the Arbitrator Harold Curry held an arbitration hearing (see doc.19, Ex.C-Hearing Transcript).  Following the hearing, the parties submitted briefs (doc.23, ¶3).  On April 8, 2005, the Arbitrator's written Decision was issued  (doc.23, Ex.C-Publication of Award, Ex.A-Arbitrator's Opinion and Award).

The Arbitrator set out the factual background (doc.23, Ex.A, p.3-9), delineated the applicable Agreement Articles, 1-2, 5, 25, and 27, Id., p.9-12, noted the testimony of eight witnesses and the parties' positions, Id., p.12-33, discussed the facts, and thereafter rendered a decision.  Id., p.35-47.  The Arbitrator found "that the implementation of the predictive selling system by [CCB] on May 3, 2004 violated the [Agreement]" (doc.23, Ex.A, p.45-47, ¶1-8, 10).  The Arbitrator noted:

> [CCB] argues that it engaged in good faith bargaining with the Union before it implemented the [pre-sell] system.  Fundamentally, in order for [CCB] to obtain the right under Article 2 to change from the conventional method of distribution to the predictive selling method requires the mutual consent of it and the Union.
>
> Indeed, under the [Agreement], [CCB] has the right to create new job classifications and make route changes within the bargaining unit; and the Union has a right to grieve those creations. [CCB] also has the right to create new job classifications under its management rights outside the bargaining unit, so long as their implementation

does not conflict with any other provisions in the contract.

While Article 27 of the [Agreement] permits [CCB] to set initial wages for new job classifications seven (7) days after the parties failed to agree to such a change, the change referenced in this article does not extend to changes in the distribution systems.

Stated another way, in January of 2004, the current [Agreement] contained no language that would allow [CCB] to leap frog the condition precedent of mutual consent as a requirement to implement a new [distribution] system.

* * *

Having concluded that the implementation of the predictive selling system conflicts with other provisions in the current Agreement, the next question is whether [CCB] subsequently took the proper and necessary steps to acquire that authority.

The evidence... indicates that on June 12, 2002, [CCB] informed the Union that it was contemplating switching to a pre-sell system in the not too distant future. The evidence further indicates that the Union expressed resistance to the intended change. Nonetheless, the current [Agreement] was signed by both parties on August 27, 2002 without inclusion of any language regarding a change in the method of distribution of products.

Therefore, the arbitrator finds that the exchanges that took place between [CCB] and the Union prior to the execution of the 2002-2005 [A]greement did not alter the language of Article 2.  Moreover, [CCB] cannot infer acceptance of its [distribution] plan from the Union's silence or rejection of it.

In the months that immediately followed the execution of the current [A]greement, the parties were relatively reticent on the theme of changing distribution systems.  However, between January 2004 and May 3, 2004, [CCB], by both written and verbal communications, made clear to the Union its plans to change to a pre-sell system. More than that, it requested the Union's input on the implementation of a new pre-sell system.  While the parties exchanged information and met several times, the evidence indicates that they never mutually consented to the implementation of a predictive sell system.  Nonetheless, on May 3, 2004, [CCB] unilaterally switched to the predictive sell system.

Thus, the arbitrator finds that prior to May 3, 2004, the parties did not mutually agree to the implementation of a new or predictive sell system.

Id., p.42-45.

With regard to implementation of the Arbitrator's Decision, the Arbitrator noted that he lacked "sufficient information to make a definitive and plenary determination" regarding "the financial impact the implementation of the predictive selling system has had on the bargaining unit employees" and "the

operational impact of restoring the bargaining unit employees in the newly created positions... to their former positions..." Id., p.46, ¶9.  The Arbitrator then noted that he would retain jurisdiction "upon the parties' written request to resolve "any disputes arising from the implementation of this award, including reopening the record to determine entitlements of the Union or any other make whole remedy."  Id., p.47. Neither party made such a written request (doc.26, p.4).

   By letter dated April 15, 2005, CCB expressly announced that "it does not consent to release of the arbitral decision and order for publication and will not consent to extending the [A]rbitrator's jurisdiction..." (doc.19, Ex.B).  Also on April 15, 2005, CCB filed this action seeking to vacate the Award (doc.1).

During the pendency of this subject action, the parties agreed to a successor collective bargaining agreement.  CCB states that the successor agreement was ratified by the parties in August 2005, but it has not been signed (doc.26, p.6, n.6).  The Union states that the successor agreement does not resolve the subject dispute (doc.23, ¶6).

<u>C.  Discussion</u>

Because the cross Motions For Summary Judgment are substantially intertwine both factually and legally, this court discusses and addresses the issues raised and the arguments presented by both parties, rather than addressing each Motion separately.  CCB asks this court to vacate the Arbitrator's Decision and Award; the Union asks that it be upheld and that the [A]ward be enforced.

There is no dispute that the Agreement expressly provides for binding arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, <u>et seq.</u>, under the rules of the Federal Mediation and Conciliation Service.  <u>See</u> doc.23, Ex.A, p.33-35, Art.33.  CCB initiated this action with a "Complaint," which this court construes, pursuant to 9 U.S.C. § 9, 12, as CCB's petition to vacate the Award.[4]  As grounds, CCB

---

[4]        A party initiates judicial review of an arbitration award not by filing a complaint in the district court, but rather by filing either a petition to confirm the award or a motion to vacate or modify the award.  <u>See</u> 9 U.S.C. § 9...; § 12... These rules further the [FAA]'s policy of expedited judicial action because they

alleges that "the [A]rbitrator's [D]ecision does not draw its essence from the parties' [Agreement] and that the [D]ecision and [A]ward is so vague that the parties do not know how to comply with [it]..." (doc.19, attach.16, p.1).

Arbitration is the "decidedly favored" means of resolving disputes arising under a collective bargaining agreement.  United Paperworkers v. Misco, Inc, 484 U.S. 29, 37 (1987); accord Major League Baseball Players' Ass'n v. Garvey, 532 U.S. 504, 509 (2001); MillCraft-SMS Services v. United Steel Workers of America, AFL-CIO-CLC, 364 F.Supp.2d 1176, 1182 (N.D.Ala. (Oct. 25, 2004)).  Federal courts are empowered by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to review decisions of labor arbitrators.  See Garvey, 532 U.S. at 509.  However,

> [j]udicial review of a labor-arbitration decision pursuant to such an agreement is very limited.  Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement.  Paperworkers v. Misco, Inc., 484 U.S. 29, 36... (1987).  We recently reiterated that if an "arbitrator is even arguable construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" Eastern Associated Coal Corp. v. Mine Workers, 531 U.S. 57, 62... (2000) (quoting Misco, supra, at 38).  It is only when the arbitrator strays from interpretation and application of the agreement and effectively "dispenses his own brand of industrial justice" that his decision may be unenforceable.  Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960).[5]  When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, factfinding" does not provide a basis for a reviewing court to refuse to enforce the award.  Misco, 484 U.S. at 39.
>
> In discussing the court's limited role in reviewing the merits of arbitration awards, we have stated that "'courts... have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim.'" Id. at 37 (quoting Steel-workers v. American Mfg. Co., 363 U.S. 564, 568... (1960)).  When the judiciary does

---

> prevent a party who has lost in the arbitration process from filing a new suit in federal court and forcing relitigation of the issues...  Moreover, the district court need not conduct a full hearing on a motion to vacate or confirm; such motions may be decided on the papers without oral testimony...

Booth v. Hume Publishing, Inc., 902 F.2d 925, 932 (11th Cir. 1990) (citations omitted).

    [5]  Enterprise Wheel & Car, 363 U.S. 593, is the most recent of the "Steelworkers Trilogy," decided by the United States Supreme Court in 1960, in which the Supreme Court announced the basic principles of deference in judicial review of arbitration decisions: Enterprise Wheel & Car, 363 U.S. 593; United Steelworkers v. Warrior & Gulf Navig. Co., 363 U.S. 574; and United Steelworkers v. American Mfg. Co., 363 U.S. 564.

so, "it usurps a function which... is entrusted to the arbitration tribunal." <u>Id.</u>, at 569; <u>see also</u> <u>Enterprise Wheel & Car Corp.</u>, <u>supra.</u>, at 599 ("It is the arbitrator's construction [of the agreement] which was bargained for..."). Consistent with this limited role, we said in <u>Misco</u>, that [e]ven in the very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result." 484 U.S., at 40-41,...

* * *

...But even "serious error" on the arbitrator's part does not justify overturning his decision, where... he is construing a contract and acting within the scope of his authority. <u>Misco</u>, <u>supra.</u>, at 38...

<u>Garvey</u>, 532 U.S. at 509-10 (footnote added); <u>Millcraft-SMS Services</u>, 346 F.Supp.2d at 1182-83.

In <u>Steelworkers v. Enterprise Wheel & Car Corp.</u>, the Supreme Court stated that

[t]he refusal of courts to review the merits of an arbitration award is the proper approach. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards... [T]he arbitrators under these collective agreements are indispensable agencies in a continuous collective bargaining process. They sit to settle disputes at the plant level - disputes that require for their solution knowledge of the custom and practices of a particular factory or of a particular industry as reflected in particular agreements...

363 U.S. at 596 (footnote omitted).

The Eleventh Circuit interprets this standard "strictly." <u>Millcraft-SMS Services</u>, 346 F.Supp.2d at 1183. In <u>Millcraft-SMS Services</u>, the district court succinctly re-capped the Eleventh Circuit's standard which

[r]equires that, in order to prevail, an employer seeking to vacate an arbitrator's award "must refute every reasonable basis upon which the arbitrator may have acted." <u>Osram Sylvania, Inc. v. Teamsters Local Union, 528</u>, 87 F.3d 1261, 1264 (11th Cir. 1996): <u>Sullivan, Long & Haggerty</u>, 980 F.2d 1424, 1429 (11th Cir. 1993). ...The <u>Osram Sylvania</u> Court observed that an award "may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet it may not be subject to court interference." 87 F.3d at 1263 (<u>quoting</u> <u>Delta Air Lines v. Air Line Pilots Assoc.</u>, 861 F.2d 665, 670 (11th Circuit 1988)). "The court may not reevaluate supposed inconsistencies in the arbitrator's logic or review the merits of the arbitrator's decision..." <u>Local 863 Int'l Bhd. of Teamsters v. Jersey Coast Egg Producers, Inc.</u>, 773 F.2d 530, 534 (3rd Cir. 1985); <u>accord</u> <u>Florida Power Corp. v. Int'l Bhd of Electrical Workers</u>, 847 F.2d 680, 683 (11th Cir. 1988). "A court may not vacate an arbitral award unless it is irrational, exceeds the scope of the arbitrator's authority' or 'fails to draw its essence from the collective bargaining agreement.'" <u>IMC-Agrico Co. v. Int'l Chemical Workers Council of the UFCW</u>, 171 F.3d 1322, 1325 (11th Cir. 1999) (<u>quoting</u> <u>Butterkrust Bakeries v. Bakery</u>

<u>Workers Int'l Union Local 361</u>, 726 F.3d 698, 699 (11th Cir. 1984)).

346 F.Supp.2d at 1183.  Simply put, "[t]he substantive review of a labor arbitration award 'is limited to a determination of whether an award is irrational, whether if fails to draw its essence from the collective bargaining agreement or whether it exceeds the scope of the arbitrator's authority.'"  <u>Sullivan, Long & Haggerty</u>, 980 F.2d at 1426 (<u>citing</u> <u>Butterkrust Bakeries</u>, 726 F.2d at 699).  Courts do not sit, in arbitration cases, to make findings of fact about the dispute or to interpret an agreement; that authority resides solely with the Arbitrator.  <u>Sullivan, Long & Haggerty</u>, 980 F.2d at 1429 (<u>citing</u> <u>Misco</u>, 484 U.S. at 39); <u>see also</u> <u>Millcraft-SMS Services</u>, 346 F.Supp.2d 1185.  "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.  <u>Sullivan, Long & Haggerty</u>, 980 F.2d at 1427; <u>Millcraft-SMS Services</u>, 346 F.Supp.2d at 1183.

Herein, in support of its request to have the Award vacated, CCB raises three contentions: the Award is incomplete; it was rendered untimely; and it fails to draw its essence from the Agreement.

First, CCB contends that the Arbitrator's Award is incomplete and that it cannot comply with the vague remedy set out by the Arbitrator (doc.19, attach.16, p.12, ¶1-2).  CCB argues that it would be difficult to make the affected employees "whole" as the payroll records indicate that the employees, generally, fared better financially on the "pre-sell" system and there was no particular injury.  <u>Id</u>., ¶3.  CCB argues that the Arbitrator provided no details regarding how to facilitate the "make-whole" remedy imposed (doc.26, p.5).  CCB further argues that the Arbitrator's Award does not address whether the "pre-sell" system should be abandoned, an issue insofar as the "pre-sell" system is currently in place and has been mandated under the latest collective bargaining agreement (doc.19, attach.16, p.12-13, ¶3).  CCB also argues that the Arbitrator's indication that he would retain jurisdiction upon the parties' written request for the purpose of resolving disputes arising from the implementation of the Award, further demonstrates that the Award is incomplete.  <u>Id</u>., p.13-18, ¶6-15.

Second, CCB contends that the Arbitrator's Decision and Award was issued untimely under the

Federal Mediation and Conciliation Service rules which requires an award no later than sixty days from the closing of the record.  Id., p.20, ¶18.  CCB argues that the record closed on October 22, 2004, and the parties' briefs were due and filed on December 15, 2004; the Award was not filed until April 8, 2005.  Id., and p.8, ¶14.

CCB's first two contentions fall outside the standard set out by the United States Supreme Court in Garvey, 532 U.S. at 509-10, and the Eleventh Circuit in Millcraft-SMS Services, 346 F.Supp.2d at 1183.  CCB asserts neither that the Arbitrator's Decision and Award is irrational, nor that it exceeds the scope of the Arbitrator's authority.  Sullivan, Long & Haggerty, 980 F.2d at 1426.

Moreover, this court's review of the Decision and Award finds that it is neither vague, nor incomplete as to the issue of liability.  The Decision and Award reflects that the Arbitrator had a hearing, gave the parties an opportunity to examine and cross-examine witnesses, to present and challenge documentary evidence, to make opening and closing arguments, and to submit post-hearing briefs.  Thereafter, the Arbitrator issued a detailed opinion, clearly finding in favor of the Union, "that the implementation of the predictive selling system by [CCB] on May 3, 2004 violated the [Agreement]" (doc.23, Ex.A, p.45-47, ¶1-8, 10).  The Arbitrator then stated with regard to the remedy, that he lacked "sufficient information to make a definitive and plenary determination" as to "the financial impact the implementation of the predictive selling system has had on the bargaining unit employees" and on "the operational impact of restoring the bargaining unit employees in the newly created positions... to their former position..." Id., ¶9.[6]

---

[6] The Arbitrator noted that he

is not convinced of what financial losses, if any, the Union has suffered.  For example, Mr. Armstrong of the Union [John Robert Armstrong, member of the Union's Board of Trustees] testified, on the one hand, that the predictive system is costing him $160.00 a week.

On the other hand, [CCB] presented, without describing each employee in the affected class with particularity, that on the average the delivery merchandisers earned $3,600 to $7,200 more annually than they did as route delivery drivers/salespersons.

(doc.23, Ex.A, p.41).  The Arbitrator also noted:

The Union contends that this court should uphold the Arbitrator's imposition of the Award including the "make-whole" monetary remedy and the Arbitrator's decision to retain jurisdiction to resolve disputes regarding that remedy (doc.23, p.5). The Union points out that "the Arbitrator did not set out a precise monetary amount for the "make-whole" portion of the remedy, but instead left that for the parties to attempt to work it out on their own, with recourse to [the Arbitrator] for further decisionmaking if necessary." (doc.27, p.3). The Union argues that "[i]n any sort of back-pay calculation, there are many possible subjects of dispute as to what should be included [and] what should be deducted..." (doc.23, p.5).

This court finds that the Arbitrator, after resolving the liability issue, prudently left the financial impact and restoration issues for future negotiations between the parties, offering to retain jurisdiction upon the parties' written request to resolve "any disputes arising from the implementation of this award, including reopening the record to determine entitlements of the Union or any other make whole remedy." Id., p.47. Such remedies are common in labor arbitration and labor arbitrators have broad discretion as to remedies once they have found a violation of a collective bargaining agreement. See Enterprise Wheel & Car, 363 U.S. at 597 ("When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies.").

With regard to the issue of untimeliness of the Decision and Award, this court notes that procedural aspects of arbitrable disputes are for the Arbitrator, not for the Court. Misco, 484 U.S. at 40. Moreover, although CCB raises the issue of timeliness, CCB has proffered no legal, jurisprudential or

---

To be sure, [CCB's] calculations are somewhat specious in that the comparative wage survey on which it is based only covers a thirteen (13) week period. More significantly, Mr. Strong's testimony [Michael Alvin Strong, Unit Manager for CCB] regarding "on the average" allows for the fact that some or even most of the affected union employees might be making less under the new system, such as Mr. Armstrong. Therefore, the full economic impact of the predictive sell system on bargaining unit employees remains speculative and uncertain.

Id., p.44.

regulatory support establishing that the untimeliness of a decision and award is the type of "'procedural

aberration[]' that constitute 'affirmative misconduct'" sufficient for this court to vacate or even remand an

arbitrator's decision and award.  See Garvey, 532 U.S. at 511; Misco, 484 U.S. at 40-41.

Third, CCB contends that the Decision and Award does not draw its essence from the Agreement

(doc.19, attach.16, p.14, ¶8).  CCB argues that the Arbitrator examined Article 2 of the Agreement and

stated that it "unquestionably empowers the Employer to switch from the conventional mode of

distribution to a predictive system without further negotiations with the Union," but noted that the last

sentence of Article 2 "includes language that potentially restricts the Employer's right to manage its

operations."  Id., p.15, ¶10 (footnote omitted), referring to Ex.A-Arbitrator's Opinion and Award, p.35.

CCB contends that the Arbitrator's issue "whether the...management right clause is broad enough in

scope to include changing its distribution system," hinges on whether it nullifies or conflicts with specific

provisions in other parts of the Agreement."  Id., p.15-16, ¶10, referring to Ex.A, p.36.  CCB argues that

> the [A]rbitrator never answers the issue that he poses...  The decision does not state how
> pre-sell conflicts with provisions of the [Agreement]...  Also, because only Art. 2 and Art.
> 27 § 9 [Wages] were included in the [A]rbitrator's findings, it appears as though these
> were the portions of the [Agreement] on which his determinations relied.  (Ex.A at p.45-
> 46).  Due to the [A]rbitrator's failure to address the key issue he posed, the award does
> not draw its essence from the [Agreement] and should be vacated...
>
>       The [A]bitrator also did not discuss the provision of the [Agreement] dealing
> with "re-routes," which expressly does permit [CCB] to change its distributions system as
> it did.  The [Agreement] anticipates "re-routes", which are changes in the distribution
> system that did take place in the implementation of pre-sell...  The [Agreement] permits
> unilateral changes by the employer and identifies the obligations of the employer in the
> event of a "re-route" in the distribution system...  When the employer "implements a
> restructuring of routes that involves 25 percent or more of routes in that branch/location",
> the employer must post the routes and bid the routes pursuant to seniority [Art.5(C)]...

(doc.19, attach.16, p.16-17, ¶11-13).  CCB argues that the Arbitrator ignores the plain language of the

Agreement (doc.26, p.7).

CCB relies on Clinchfield Coal Co. v. District 28, United Mine Workers of America & Local

Union #1452, 720 F.2d 1365, 1369 (4th Cir. 1983).  In Cinchfield, the court stated that the award would

be unsatisfactory if it allowed "an arbitrator to shield his award simply by the ruse of stating an issue

without discussing it." <u>Id</u>.  Such an award "cannot be considered to draw its essence from the contract."

<u>Id</u>.  "When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to

refuse enforcement of the award."  <u>Enterprise Wheel & Car</u>, at 597; <u>Clinchfield</u>, at 1368.

The Union, relying on <u>Garvey</u>, 532 U.S. at 509-10, counters that herein the Arbitrator interpreted

the Agreement and his Opinion contains extensive discussion as to why the Arbitrator interpreted the

Agreement in the way he did.  "There is no hint that the arbitrator was doing anything *other than*

interpreting the [Agreement]."  (doc.23, p.4) (emphasis in original).

This court agrees with the Union.  As this court has previously noted, the Decision and Award is

clear.  The Arbitrator looked at all the evidence presented including the Agreement (specifically Articles

1-2, 5, 23, 25, 27, 39[7]), and considered the arguments of the parties.  The Arbitrator clearly resolved the

issue posed -

> in order for [CCB] to obtain the right under Article 2 to change from the conventional
> method of distribution to the predictive selling method requires the mutual consent of it
> and the Union.
>
> * * *
>
> While Article 27 of the [Agreement] permits [CCB] to set initial wages for new
> job classifications seven (7) days after the parties failed to agree to such a change, the
> change referenced in this article does not extend to changes in the distribution systems.
>
> ...[T]he current [Agreement] contained no language that would allow [CCB] to
> leap frog the condition precedent of mutual consent as a requirement to implement a new
> [distribution] system.

(doc.23, Ex.A., p.42).  Moreover,

> ... When more than one contract provision is implicated, an arbitrator is at liberty to
> determine which of two competing contract provisions governs over the other.  <u>U.S.
> Postal Serv. v. Nat. Ass'n of Letter Carriers</u>, 789 F.2d 18, 20 (D.C. Cir. 1986)
> (recognizing that arbitrator's conclusion as to which competing contract language
> "controlled 'was itself' an interpretation of the contract which this court has no authority
> to disturb."); <u>IMC-Agrico</u>, 171 F.3d at 1328 ("Where there are two plausible
> interpretations of an agreement, then the arbitrator's choice of one over the other will be
> honored.").

---

[7]  <u>See</u> doc.23, Ex.C, p.4-5, 7-12, 21-22, 27, 29-30, 32, 35-39, 42-43, 46.

Millcraft-SMS Services, 346 F.Supp.2d at 1183.

CCB also charges that the Arbitrator did not discuss the provision of the Agreement "dealing with "re-routes," which CCB argues expressly permits it to change its distributions system, referring to Art.5(C). CCB is mistaken. This court's review of the Decision and Award reflects:

> [CCB] also argues that "a major change in the sales department such as a restructuring of routes that involves 25% or more routes in that branch/location allows it to unilaterally change to a predictive system". Although this is an intriguing argument, it would be a stretch and misconstruction of the language contained in this provision to conclude that it would permit a change of the magnitude suggested. For there is a profound difference between a major restructuring of routes and the elimination of most or all of the selling duties that employees acquire through negotiations. Thus, the arbitrator opines that based on the restructuring of routes, Article 2 prohibits a unilateral change in the distribution system by use of this method.

(doc.23, Ex.A, p.38). CCB is mistaken; the Arbitrator clearly discussed "re-routes."

In sum, this court finds that the Arbitrator's Decision and Award is neither irrational, nor does it fail to draw its essence from the Agreement. Sullivan, Long & Haggerty, 980 F.2d at 1426. As noted, CCB never charged that the Arbitrator exceeded the scope of his authority. The parties bargained for final and binding arbitration (doc.23, Ex.A, p.33-35, Art.33) and got it. This court finds that the Arbitrator "arguably" construed the contract. Garvey, 532 U.S. at 511-12. As such, this court finds that the Arbitrator's Decision and Award should be upheld.

In light thereof, CCB's request that upon remand, if so ordered, the matter be remanded to a different Arbitrator is hereby MOOT.

### D.  Conclusion

Accordingly, for the reasons stated, it is ORDERED that CCB's Motion For Summary Judgment (docs.19-20), be and is hereby DENIED; and it is further ORDERED that the Union's Motion For Summary Judgment (docs.21-23), be and is hereby GRANTED. The Arbitrator's Decision and Award is hereby UPHELD.

This court will consider the Union's well documented and legally supported request for attorneys' fees expended in its enforcement effort, filed pursuant to Rule 54(d) of the Federal Rules of Civil

Procedure.

DONE this 26th day of January, 2006.


   S/Virgil Pittman
SENIOR UNITED STATES DISTRICT JUDGE